In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-568 CV


____________________



In the Interest of S.M.M., a child







On Appeal from the 279th District Court


Jefferson County, Texas


Trial Cause No. F-177,221






OPINION


 Sonja Nicole Allen Martin (Sonja) and Neal Allen Martin (Neal) appeal the
termination of their parental rights to their son, S.M.M. Although the cause was tried
together, Sonja and Neal prosecute separate appeals. Neal's lone appellate issue inquires: 
"Should the Court have granted a continuance of the trial in order to remedy the problems
with the telephone conference equipment to allow Neal Martin to effectively assist his
counsel in the defense of the matter?" Sonja's issue contends that the record evidence is
not factually sufficient to support the trial court's findings. We will address Neal's issue
first.

 The record reflects that at the time of the termination hearing, Neal was incarcerated
in Florida. However, Neal's trial counsel was present in the courtroom in Beaumont
where the hearing was taking place. Neal appeared at the hearing via telephone as per his
previously filed written motion. Early on in the hearing, problems arose with the
telephone connection between Beaumont and Florida. Because of a statutorily-imposed
deadline, (1) the trial court decided to proceed with testimony in hope that the mechanical
problems with the connection to Neal would be corrected. At this point, Neal's trial
counsel makes the following objection which is the only objection on the issue contained
in the record: 

 [Neal's Trial Counsel]: That's correct, Your Honor. I've written
letters to Mr. Martin. He's written letters to me; and I have had a chance
to speak with him today. If it's the Court's intention to go through with the
trial without Mr. Martin being here by telephone - - and it's my
understanding that's what the Court is going to do - - I'd like to have the
record clear that we would object to that, being that we've got a motion on
file and order signed allowing Mr. Martin to be here through telephone
conference. I understand it's nobody's fault the phone lines aren't working;
but I would like the record to reflect I object to the trial going forward
without Mr. Martin as [sic] least being by telephone.


 Following this objection, the trial court permitted petitioner to call its next witness. 
Shortly thereafter, telephone contact was reestablished with Neal. Immediately thereafter,
the trial court summarized for Neal the brief portion of testimony he had missed. Again,
Neal's attorney was present in the courtroom and was not hindered in making any proper
objections to the testimony or to any other evidence presented. At one point during the
direct examination of this witness, Neal requested to speak, and the trial court permitted
Neal to interject a comment. During cross-examination of the witness by Neal's trial
counsel, the trial court, on its own initiative, cleared the courtroom so that Neal and his
trial counsel could consult in private as to the continued cross-examination of the witness
testifying to Neal's prior criminal history. 

 Termination hearings are civil proceedings. Our system of justice comprehends due
process to include notice and an opportunity to be heard. See Mullane v. Cent. Hanover
Bank & Trust, 339 U.S. 306, 313-14, 70 S.Ct. 652, 94 L.Ed. 865, 873 (1950); Ex parte
Peterson, 444 S.W.2d 286, 288-89 (Tex. 1969). Due process has been held to mean
"notice, and an opportunity to be heard and to defend in an orderly proceeding adapted to
the nature of the case. It means 'a law which hears before it condemns, which proceeds
on inquiry, and renders judgment only after trial.'" See Masonic Grand Chapter of Order
of Eastern Star v. Sweatt, 329 S.W.2d 334, 337 (Tex. Civ. App.--Fort Worth 1959, writ
ref'd n.r.e.) (quoting 16A C.J.S. Constitutional Law § 567, p. 542) (citation omitted). 

 After examining the record before us, we find that due process was scrupulously
protected by the trial court. Appellate counsel's characterization of the trial court as
having "excluded" Neal from the hearing is simply incorrect. The instances cited in
Neal's appellate brief of his "exclusion" were of very short duration with Neal's trial
counsel always present. The trial court gave Neal the opportunity to consult privately with
his trial counsel on numerous occasions during the course of the hearing and Neal was
permitted to present his case fully to the trial court. We can discern no denial of Neal's
due process rights contained in the record before us. Neal was given "notice," "an
opportunity to be heard," and the full opportunity "to defend in an orderly proceeding
adapted to the nature of the case." We therefore overrule Neal's appellate issue and affirm
the trial court's order of termination as to Neal's parental rights of S.M.M. 

 We now turn to Sonja's factual sufficiency complaint. Her appellate brief points
to factually insufficient evidence in the following areas: 

 1. Factually insufficient evidence to support trial court's finding that Sonja
knowingly placed or allowed S.M.M. to remain in conditions or
surroundings which endangered S.M.M.'s physical well-being.


 2. Factually insufficient evidence to support the trial court's finding that
Sonja constructively abandoned S.M.M.


 3. Factually insufficient evidence to support the trial court's finding that
Sonja failed to comply with the provisions of a court order that specifically
established the actions necessary for Sonja to obtain the return of S.M.M.


 4. Factually insufficient evidence to support the trial court's finding that
Sonja used an unlawful controlled substance in a manner that endangered the
health or safety of S.M.M., and (1) failed to complete a court ordered
substance abuse program; or (2) after completion of a court ordered
substance abuse treatment program continued to abuse a controlled
substance.


 5. Factually insufficient evidence to support the trial court's finding that
termination of Sonja's parental rights to S.M.M. is in the best interest of
S.M.M. 


 The newly-announced appellate standard of review in parental termination cases
requires the reviewing court to determine whether the factfinder could reasonably form a
firm belief or conviction about the truth of the petitioner's allegations. In the Interest of
C.H., No. 00-0552, 45 Tex. Sup. Ct. J. 1000, 2001 WL 1903109, at *8 (July 3, 2002). 
Furthermore, a finding on any one of the nineteen grounds listed under Tex. Fam. Code
Ann. § 161.001(1) (Vernon Supp. 2002), coupled with a finding that termination is in the
best interest of the child, is sufficient to terminate parental rights. See Edwards v. Texas
Dep't of Protective and Regulatory Servs., 946 S.W.2d 130, 134 (Tex. App.--El Paso
1997, no writ). 

 In the instant case, we need look no further than Sonja's testimony to find factually
sufficient evidence to support the findings of the trial court. At the outset of her direct
examination, Sonja admitted that she used drugs before Neal "introduced" her to drugs, (2)
and continued to use drugs after having "rid" herself of Neal. Furthermore, Sonja's
"rationale" for her insistence on remaining S.M.M.'s mother was essentially that S.M.M.
kept her off drugs. This theme was repeated during the course of her testimony and
excerpted as follows:

 Q.[Sonja's Trial Counsel] You've told me that the decision to leave [L.M.],
[Sonja's daughter voluntarily placed for adoption prior to S.M.M.'s birth]
there was because you needed to?


 A.[Sonja] Because at the time that was the best thing. I was unable to care
for her the way she should be cared for. That's not the case with [S.M.M.]. 
I left Indiana against her [L.M.'s and S.M.M.'s adoptive mother/Sonja's
maternal aunt] wishes because I wanted to keep my family together; and I
thought [S.M.M.] kept me clean, so he could keep Neal clean, you know. 
My being with him [S.M.M.] constantly is what helped me stay clean. So,
since it occurred with him when he was out of town, I thought that if we
were together and he [Neal] come [sic] home to him [S.M.M.] every day,
that he [Neal] could stay clean. It was for my family to stay together. 


 Q. And did he stay clean?


 A. No, neither one of us did, actually. 


 . . . .


 Q.[Attorney Ad Litem for S.M.M.] All right. A minute ago you were
asked whether or not you've done drugs recently; and I think you said yes? 


 A.[Sonja] No; I don't think I was asked recently. I said in the past, I
believe. 


 Q. Have you done drugs since your son was taken away from you?


 A. Yes.


 Q. All right. When?


 A. When he was first taken. I - - I got really bad back out there; and I just
lost all hope. I figured I had done so much, I put forth a lot of effort to stay
clean and get myself at the point I was there, with my truck and my
apartment; and - - this stability. The truck was the first thing. Second thing
that job was going to get us a down payment on the home because I didn't
went [sic] my son traveling around. I wanted stability for him. So Neal and
I had the deal he would get his truck and by the time [S.M.M.] was a year
old, I'll get a house.


 . . . .


 Q. You said that you went through a bad spell and you're doing a lot of
drugs after your son was taken?


 A. Uh-huh.


 Q. Were you doing tricks at that period of time?


 A. No, no. 


 Q. How were you supporting a drug habit?


 A. I have [sic] living with a dealer.


 Q. Who was that?


 A. A friend of mine I was living with. 


 . . . . 


 Q.[Attorney Ad Litem] Okay. The fact is that you and he [Neal] had a bad
drug problem. You committed crimes in the past. You tried to move to
Indiana and get your life straight again; is that right?


 A.[Sonja] Yes, sir.


 Q. And then things went to hell in a hand basket?


 A. No, they all worked. Everything.


 Q. He started using drugs again; right?


 A. Yes.


 Q. All right. Sold all his tools, right?


 A. Pawned them, yes. 


 . . . .


 Q. At this point you know you've got a drug problem; right?


 A. Yes, sir.


 Q. All right. Weren't you concerned if you moved off out of Indiana where
you had been straight for a period of time to go back with your husband,
who's at that point using drugs again, that you're going to get back into your
drug habit?


 A. No. Honestly, I believed if we were together we can - - we would be
okay. I honestly believed that's why he made the mistakes is because he was
off by himself; and it was easy for me to wake up and look at [S.M.M.] and
look at him every day and stay clean. . . . 


 . . . .


 Q. Okay. 


 A. He never used at home around the baby; and neither did I. So I honestly
believed if we were together, he would stay clean. I did what I did for my
family.


 Q. That didn't happen; did it?


 A. No, sir, it didn't.


 Q. Okay. And after [S.M.M.] - - after he [Neal] was put in prison, you
went back to drugs as well?


 A. I was left on the streets, knowing nobody, a million miles from home;
and I knew nothing else to do. 


 . . . .


 Q.[Attorney Ad Litem] All right. Did you tell people back after you gave
up [L.M.] that you were through with drugs, you weren't going to do
anything anymore?


 A. Yeah, I was pregnant with [S.M.M.] and that's exactly what I did. 


 Q. But the fact is you went - - 


 A. After my son was taken from me.


 Q. All right. 


 A. Everything that I worked for to stay off of drugs was taken from me.


 Q. Okay. 


 A. Everything. 


 From this bit of testimony, the trial court was presented with a clear picture of the
instability and fragility of Sonja's ability to stay "clean" from drugs, and how she
continually relied on S.M.M. for her "strength" to stop ingesting illegal narcotics. The
trial court could have concluded that such a burden placed on an infant by its mother was
not in the child's best interest, and indeed allowing the child to remain in such conditions
would endanger the physical and emotional well-being of the child. Sonja's pattern of
"coping" with life's setbacks by returning to drugs and the streets was abundantly present
in her testimony. This testimony is factually sufficient to support trial court's finding
6.2.1. 

 Additional evidence from the hearing supports trial court's finding 6.2.3., which
required Sonja to comply with the provisions of the court order that specifically established
the actions necessary for her to have obtained the return of S.M.M., who had been in the
custody of Child Protective Services as the result of S.M.M.'s removal following the
events of June 12, 2000. The court order, dated June 21, 2000, ordered Sonja to comply
with each requirement set out in the family service plan drawn up by Department of
Protective and Regulatory Services personnel. Said family service plan, dated June 26,
2000, included certain "goals" requiring Sonja to engage in certain positive parental and
lifestyle activities, and refrain from certain negative ones. Two of the enumerated "goals"
stated the following:

 Goal Description: Parent will stop participating in criminal acts and deals
with consequences of previous involvement.


 Goal Description: Parent will demonstrate an ability to stay away from a
drug/alcohol lifestyle. 


 Introduced into evidence as Petitioner's Exhibit 2 was the judgment in a criminal
case in which Sonja pleaded guilty to the felony offense of Delivery of a Controlled
Substance, with the offense date as being "February 13, 2001." Obviously, Sonja did not
curtail her drug lifestyle. Furthermore, prior to any of the triggering events of June 12,
2000, when S.M.M. was taken into protective custody by Child Protective Services, Sonja
was on probation out of Florida for "grand theft." Nevertheless, the record indicates that
although the family service plan required Sonja to "follow all court ordered conditions of
her probation," Sonja admitted during cross-examination that she had no intention to return
to Florida in order to deal with the terms of her probation there. This was an admitted
violation of the family service plan and, therefore, a violation of the trial court's order for
Sonja to comply with the terms of any family service plan. The admitted acts and admitted
omissions by Sonja are record evidence that is factually sufficient to support the findings
by the trial court so as to permit the termination of Sonja's parental rights to S.M.M. 
Sonja's appellate issue is overruled. We affirm the trial court's order of termination as to
both Neal and Sonja. 

 AFFIRMED. 


 PER CURIAM



Submitted on August 14, 2002

Opinion Delivered August 29, 2002

Do Not Publish 


Before Walker, C.J., Burgess and Gaultney, JJ.
1. See Tex. Fam. Code Ann. § 263.401 (Vernon Supp. 2002).
2. This appears to be a rather oxymoronic factual contention.